STATE

v.

**David MOREL.**

No. 94–631–CA.

Supreme Court of Rhode Island.

May 30, 1996.

Aaron Weisman and Jane McSoley, Asst. Attorneys General, for Plaintiff.

Janice Weisfeld and Paula Rosin, Asst. Public Defenders, for Defendant.

## OPINION

LEDERBERG, Justice.

In this appeal before the Supreme Court, the defendant, David Morel, argued that the trial justice erred by admitting into evidence certain testimony on the analysis of deoxyribonucleic acid (DNA) and also abused his discretion by allowing the state to impeach the defendant with evidence of a prior criminal conviction. The defendant has appealed from a judgment of conviction of three counts of first degree sexual assault and one count of assault with a dangerous weapon after which conviction he was sentenced to concur-

rent terms of thirty years, twenty years to serve and ten suspended, on the three counts of first degree sexual assault and to a consecutive term of ten years on the count of assault with a dangerous weapon. For the reasons stated below, we deny the defendant's appeal and affirm the judgment of the Superior Court. The facts insofar as pertinent to the issues raised on appeal are briefly summarized.

## Facts and Procedural History

At some time during the late morning or early afternoon of August 27, 1990, sixteen-year-old Ann Ames (Ames) (this is not her real name) was walking in a wooded area near her home in Burrillville, Rhode Island, when she noticed a car drive past her twice. Soon after, a man, whom Ames later identified as defendant, approached her from behind and engaged her in a brief conversation. As Ames turned to leave, the man grabbed her, held a knife to her side, and while threatening to kill her if she did not remain quiet, dragged her deeper into the woods. There the man stopped, sheathed his knife, picked up and put down a rifle, and proceeded to remove Ames's clothing. The assailant then fondled Ames's breasts, penetrated her vagina digitally, forced her to perform fellatio twice, and vaginally penetrated her with his penis two times. After threatening to kill Ames and her family if she reported the incident, the man fled deeper into the woods. Ames then ran to the home of a neighbor, and from there her family and the police were called.

When the police arrived, Ames described where the attack had occurred to Officer Jeffrey Ducharme (Ducharme) of the Burrillville Police Department and related that her assailant had dropped an empty Kool cigarette package on the ground during the incident. Ducharme followed Ames's directions to the scene, found the cigarette package, and then followed a set of fresh footprints through the woods and into the neighborhood in which defendant lived.

Meanwhile the police brought Ames to the Landmark Medical Center where an examination by the emergency room physician, Elizabeth Judd, M.D. (Judd), indicated trauma to the genitalia consistent with forced sexual intercourse. At the time of the examination, Judd also collected samples from Ames's body and clothing, using a "sexual assault evidence collection kit" referred to as a "rape kit." Following the attack, Ames told Burrillville police that her assailant had a red rash in the area of his groin, that the knife he carried had a curved blade, and that his rifle had a tube underneath the barrel. Ames also assisted Rhode Island State Police in compiling a sketch of her assailant. The police later put together a lineup of six photographs, and Ames, without hesitation, identified defendant's photograph as that of her assailant.

On August 28, 1990, Pamela George Freeman (Freeman), a forensic serologist at the Rhode Island Department of Health, analyzed the contents of Ames's rape kit. Freeman later testified that seminal fluid was indicated, although it could not be positively confirmed, in the vaginal and rectal swabs taken from Ames after the assault, and seminal fluid was positively confirmed on samples of her bathing suit and shirt. On September 7, 1990, the police arrested defendant at his home and seized a knife and a rifle, which Ames later testified were similar to those of her attacker. After his arrest, a photograph was taken of defendant's groin area, which was, in fact, covered with a red rash.

On October 26, 1990, defendant was charged by indictment with two counts of first degree sexual assault by vaginal intercourse, two counts of first degree sexual assault by fellatio, one count of first degree sexual assault by digital penetration, two counts of assault with a dangerous weapon, and one count of second degree sexual assault. Prior to trial, one charge of first degree sexual assault by vaginal intercourse, one charge of first degree sexual assault by fellatio, and the second degree sexual assault charge were dismissed as duplicative, pursuant to Rule 48 of the Superior Court Rules of Criminal Procedure.

On February 4, 1991, blood was drawn from defendant at the Landmark Medical Center in Woonsocket, pursuant to a court order. On February 6, 1991, the evidence from the rape kit and defendant's blood samples were sent to the Federal Bureau of Investigation (FBI) laboratory for analysis of

the DNA in the specimens. Because the sample of defendant's blood was not suitable for analysis, a second sample was transmitted to the FBI laboratory on February 5, 1992. Special Agent Lawrence Presley (Presley) of the DNA analysis unit of the FBI laboratory compared DNA obtained from defendant's blood sample to DNA from the sperm cells found in the forensic samples from the rape kit. Trial commenced on April 26, 1993. At trial, Presley testified over objection that there was a one in one thousand chance that defendant's DNA matched that of a randomly selected Caucasian individual.

The defendant presented several alibi witnesses, all of whom testified that they had seen defendant at his parents' home in Woonsocket, Rhode Island, at various times during the day of the assault. None of the alibi witnesses could confirm, however, that defendant remained within their sight continuously on the day in question. The defendant testified on his own behalf and said that he arrived at his parents' home at approximately eleven o'clock on the morning of August 27, 1990, and remained there until eight-thirty that evening. He denied that he was Ames's assailant.

On May 4, 1993, at the close of the state's evidence, the trial justice granted defendant's motion for judgment of acquittal on the charge of felonious assault with a rifle. On May 5, 1993, following deliberations, the jury returned guilty verdicts on three charges of first degree sexual assault and the charge of felony assault with a knife.

On May 28, 1993, the trial justice denied defendant's motion for a new trial. Following his sentencing on June 23, 1993, defendant filed this appeal pursuant to G.L.1956 § 9–24–32.

### Admission of DNA Evidence

*Background Information*

Human genetic information is encoded primarily in deoxyribonucleic acid (DNA) molecules that are present in the chromosomes of all body cells that contain nuclei. Chromosomal DNA molecules are of high molecular weight but vary in length. The sequence of four organic heterocyclic bases—adenine (A), cytosine (C), thymine (T), and guanine (G)—along DNA molecules determines the genetic code of the individual. The double helix of DNA is formed by a sugar-phosphate "backbone" as a spiral ladder along which the sequence of bases across each side of the ladder structure are joined by weak hydrogen bonding. The stereochemical requirements of the bases are such that A always pairs with T, and C pairs with G by hydrogen bonding that joins the antiparallel chains of the DNA molecule. *Reference Manual on Scientific Evidence,* at 281 (Federal Judicial Center 1994).

The human genome contains genetic information encoded in the approximately 3.3 billion base pairs per set of chromosomes in each cell. More than 99 percent of the sequences of base pairs in human cells are the same for all individuals, thereby accounting for the many common traits that make all humans identifiable as a species. Only the sequences of approximately 3 million base pairs are specific to each individual (identical twins excepted) and result in most of the variation that makes each person unique. *Id.*

A gene, which chemically is a characteristic DNA sequence, is found at a specific site, or locus, on a specific chromosome. For example, a gene for eye color is found at the same locus on the same chromosome in every individual. Alleles are alternative forms of a gene at a given locus. Loci in which an allele differs among individuals are called polymorphic, and the differences are known as polymorphisms or variations. *Id.* at 281–82.

Although some polymorphisms have been found to govern functions that make individuals observably distinct from one another, others serve no known role and are believed to be "noncoding" segments of DNA molecules. Among these noncoding DNA regions are some in which certain base pair sequences repeat in tandem many times; such sequences are known as Variable Number of Tandem Repeats, or VNTR. The number and sequence of VNTR base pairs vary from locus to locus on one chromosome and from chromosome to chromosome. *Id.* at 282. The VNTR's are a leading aspect of DNA variability currently used in DNA forensic typing or "fingerprinting." Forensic DNA typing usually compares "evidentiary DNA"

(DNA recovered from a crime scene) with "suspect DNA" (DNA extracted from the blood of a suspect). *DNA Technology in Forensic Science,* at 35–36 (National Research Council 1992).[1]

The biochemical procedure known as restriction fragment length polymorphism (RFLP) analysis can determine the size of a repetitive sequence. Because the length or band size of these sequences of base pairs is highly polymorphic and not necessarily unique to an individual, comparison of several corresponding sequences of DNA from known (e.g., suspect) sources and unknown (e.g., forensic) sources produces information that can lead to the calculation of the probability that the two samples originated from the same source. *Reference Manual on Scientific Evidence,* at 282.

In RFLP analysis, DNA is extracted from an evidentiary sample collected at the crime scene and then digested by a restriction enzyme that recognizes a particular known sequence of bases, cutting the DNA into fragments of varying sizes. After this enzymatic treatment, the digested DNA from the crime sample is placed in a well at one end of a lane in an agarose gel (a gelatin-like material solidified into a slab about five inches thick), and the digested DNA from the suspect is placed in an adjacent well on the same gel. Typically, control specimens of DNA fragments of known size and, where appropriate, enzymatic fragments of DNA specimens obtained from a victim are placed on the same gel. A mild electric voltage applied to the gel results in the migration of the fragments in lanes to the opposite end of the gel. This process slowly separates the fragments in each lane by molecular length, with shorter fragments traveling farther than longer, heavier fragments. This procedure is known as gel electrophoresis. *Reference Manual on Scientific Evidence,* at 282.

The resulting array of DNA fragments is transferred for manageability to a sheet of nylon or membrane by a process known as Southern blotting. Either during or after this transfer, the DNA is denatured by heating, thereby separating the hydrogen linked double helix into single DNA strands. This process leaves the denatured DNA fragments tightly bound to the membrane at locations that are specific for the length of the fragments. Next, a "probe," usually with a radioactive "tag" or atom, is applied to the membrane. The probe is a single strand of DNA that hybridizes with, or binds to, its complementary sequence when it is applied to the samples of denatured DNA, again, A binding with T, and C with G. The DNA locus identified by a given probe is found by experimentation. Individual probes often are patented by their developers, and different laboratories may use different probes, i.e., they may test for alleles at different loci. *Reference Manual on Scientific Evidence,* at 283.

Finally, excess hybridization solution is washed off, and the nylon membrane is placed between sheets of photographic film. Over time, the radioactivity from the probe material exposes the film where the biological probe has hybridized with the sample DNA fragments. The result is an autoradiograph, or autorad, a visual pattern of bands representing specific DNA fragments. An autorad that shows two bands in a single lane indicates that the individual is heterozygous for that locus, inheriting a different allele from each parent. If the autorad yields a single band, the person may be homozygous for that allele, with each parent contributing the same variant of the gene. The two alleles constitute an individual's genotype for the specific locus associated with the probe. *Reference Manual on Scientific Evidence,* at 283.

Once an autorad is obtained, the probe is washed from the membrane, and the process is repeated with fresh photographic film with different probes that bind to different sequences of DNA. Three to five probes are typically used in each DNA fingerprint analysis, the number depending in part on the amount of testable DNA recovered from the crime sample. The result is a set of auto-

---

1. The NRC report was undertaken by the Committee on DNA Technology in Forensic Science, the Board on Biology, and the Commission of Life Sciences. The project was approved by the Governing Board of the National Research Council and the members of the committee responsible for the report were chosen for their special competences. *DNA Technology in Forensic Science,* at ii (National Research Council 1992).

rads, each of which shows the results of one probe. Taken together, the results of the probes form the DNA profile or fingerprint. *Id.* at 284.

If the two DNA samples are from the same source, and if the laboratory procedures are conducted properly, hybridized DNA fragments of approximately the same length should appear at the same points in the agarose gel lanes containing the suspect's and the crime scene evidentiary DNA specimens. If, on visual inspection, the DNA bands for the suspect and from the forensic sample appear to be aligned on the autorad, this estimate is verified by a computerized measurement. If the two bands fall within a specified length, (+2.5 percent of band length in the instant case), a "match" is declared for that probe or allele. For forensic purposes, a match means that the band patterns are consistent with the conclusion that the two DNA samples had the same source. *Id.* at 283–84.

The declaration of a match signifies only that the DNA profile of the suspect is consistent with that of the source of the crime sample. The crime sample may be from the suspect or from someone else whose profile, using the particular probes involved, happens to match that of the suspect. The statistical likelihood of someone else in the population randomly having the same DNA profile as the suspect is then calculated, using a standard population genetic equation with appropriate databases. This statistical estimate is interpreted as the probability that a person selected at random from a comparison population would have a DNA profile that matches that of the crime sample. *Reference Manual on Scientific Evidence,* at 297. One of the most contentious issues in the forensic use of DNA evidence involves the controversy over the appropriate method for computing the estimated probability of a coincidental match of a DNA profile, that is to say, the probability that a defendant's DNA sample matches that from the crime scene purely by chance. *Id.* at 300.

*The Product Rule*

The product rule technique is the most straightforward method of computing the probability of obtaining a DNA profile in which the forensic and the suspect's samples match. To compute the probability of a random occurrence of a specific pattern of alleles in the DNA profile, the separate estimated probabilities of the random occurrence of each allele in the comparison population are multiplied. *Reference Manual on Scientific Evidence,* at 300. The probability estimate resulting from the multiplication assumes that the individual alleles identified by genetic probes are independent of one another. If the probabilities of the individual alleles are not independent (i.e., if certain alleles are likely to occur together in a person), multiplying the individual allele frequencies may underestimate or overestimate the true probability of matching alleles in the chosen population and thereby misstate the incriminating value of the evidence. *Id.* at 301.

The *Reference Manual on Scientific Evidence,* at 300–01, has pointed out that "critics of the product rule technique contend that in some ethnic subpopulations the alleles identified by commonly used genetic probes are not independent and that using a broadbased comparison population is therefore inappropriate. They prefer estimation techniques that do not require analysts to assume the *independence* of the individual alleles in large comparison populations." *Id.* at 300–01. Two population geneticists have asserted that the product rule is flawed because it rests on the assumption that major population groups, such as Caucasians and Blacks, mate randomly across groups. They contended that, in fact, members of subgroups tend to mate within their own subgroup, resulting in population substructuring, which, in turn, alters the gene frequencies and renders estimates obtained through the product rule invalid. R.C. Lewontin and Daniel L. Hartl, *Population Genetics in Forensic DNA Typing, Science,* vol. 254, Dec. 20, 1991, at 1745–50.

*The Ceiling Principle*

In its first report on forensic DNA evidence in 1992, the National Research Council (NRC) noted that recent empirical studies have detected no evidence of a departure from independence within or across commonly used genetic probes. At that time, the NRC recommended the use of a modified ceiling principle technique that "assume[s] for the sake of discussion that population

substructures may exist and provide[s] a method for estimating population frequencies in a manner that adequately accounts for it." *Reference Manual on Scientific Evidence*, at 301 (internal emphasis omitted). This method takes advantage of the computation techniques of population genetics but includes two adjustments to population frequencies derived from existing data to permit more conservative estimates of the likelihood of a coincidental matching profile.

In calculating the probability of a match using the ceiling principle, the 95 percent upper confidence limit for the estimated allele frequencies is first computed for each of the existing population samples, for example, Caucasian, Hispanic, Black, and Native American. Second, the largest of these upper confidence limit estimates, or 10 percent, whichever is greater, is used to compute the joint probability of a coincidental match on the DNA profile of the crime sample. The resulting probabilities are then multiplied as in the product rule computations. The upper confidence limit is intended to address concerns that current population data may be substructured in unknown ways that could yield misleading estimates of a coincidental matching profile for members of subpopulations. The upper confidence limit from among the existing samples provides a probability estimate that errs, if at all, in a conservative direction that is more favorable to a defendant. *Reference Manual on Scientific Evidence*, at 302.

### Recent Developments

More recently, numerous scientific articles have addressed the issue of population substructuring and concluded that it does not have a significant impact on final calculations of the probability of a match. Two principals in the debate over forensic DNA typing have concluded that there is "no remaining problem that should prevent the full use of DNA evidence in any court." Eric S. Lander and Bruce Budowle, *DNA Fingerprinting Dispute Laid To Rest, Nature*, vol. 371, Oct. 27, 1994, at 735. These authors also point out that "the ceiling principle was not intended to be exclusive" and that "[e]xpert witnesses were still free to provide their statistical 'best estimate' of genotype frequencies based on the product rule." *Id.* at 736. If disagreement over product rule estimates did

arise, however, "the ceiling principle provided an approach that all parties had to admit was biased to favour a defendant." *Id.* Indeed the initial recommendation by the NRC Committee was strongly for a 5 percent ceiling principle and was modified to 10 percent only as a more conservative value. *Reference Manual on Scientific Evidence*, at 302; *DNA Technology in Forensic Science*, at 13. The ceiling principle has been said to generate "conservative numbers that tend to underestimate the true frequency of a DNA profile" and therefore presents "no scientific justification for using it." Michael L. Baird, *DNA Evidence: Who Shall Be Persuaded?* 2 ATLA Reference Materials at 2489 (Annual Convention, N.Y.1995).

In a follow-up study requested by the director of the FBI to resolve the controversy, the NRC reexamined these issues. The NRC's conclusion was that:

> "The abundance of data in different ethnic groups within the major races and the genetically and statistically sound methods recommended in this report imply that both the ceiling principle and the interim ceiling principle are unnecessary." *The Evaluation of Forensic DNA Evidence*, at 5–35 (National Research Council 1996).

### DNA Evidence in this Case

In the case at bar, a voir dire hearing was held on defendant's motion to exclude DNA evidence. The court heard testimony from Agent Presley and Kenneth Kidd, Ph.D. (Kidd). After informing the court about FBI procedures in DNA analysis described *ante*, Presley testified that he found a match between forensic samples collected in the rape kit and the known blood sample from defendant. Presley stated that when the product rule technique is used, the probability of such a random match within the Caucasian population was one in one thousand, thus excluding 99.9 percent of the Caucasian population unrelated to defendant.

On redirect examination during the voir dire hearing, Presley testified about ceiling principle statistics and the concerns of some scientists regarding the product rule and subpopulations. Presley testified that by using the modified 10 percent ceiling principle

method, approximately 99.8 percent of the population was excluded as contributing to the DNA profile in this case as opposed to the approximately 99.9 percent of the population excluded under the product rule method.

Kidd, who qualified as an expert in molecular biology and population genetics, testified that the product rule used by the FBI was the generally accepted procedure in the field of population genetics. He also told the court that although the ceiling principle had been recommended by the NRC for use in the courtroom, that approach has been "consistently and seriously criticized by the scientific community." Kidd characterized the ceiling principle as "so ultra-conservative as to obscure the truth."

Following the hearing, the trial justice found that on the basis of its "reliability and relevance," DNA product rule evidence would be admitted at defendant's trial. Presley testified that in calculating the statistical probability that individual alleles match by coincidence, the FBI lab utilizes a process known as binning, which measures the sizes of the bands, and places them in appropriate bins according to their size. The bins are defined by size markers, composed of known DNA fragment lengths. Presley further testified that the FBI has conducted studies of known specific populations, Caucasian, Hispanic, and Black, and through the analysis of blood samples, values have been assigned to the occurrence of particular alleles at targeted locations in particular populations. If a sample band falls between two bins, as determined by the size markers, the FBI assigns the band to the bin having the highest frequency of occurrence in the population, a conservative measure favoring the defendant. After each allele is assigned a percentage based on its frequency in the appropriate ethnic group, an overall estimate of a coincidental match of the entire DNA profile is calculated using the product rule method.

Presley testified that DNA obtained from fluid collected in the rape kit yielded three matches between those samples and a known dried blood sample from defendant, using restriction fragments from chromosome 2 (D2S44), chromosome 4 (D4S139), and chromosome 17 (D17S79). Thus, three out of four probe results revealed visual and numerical matches between samples taken from the victim (the rectal swabs, the debris swab, and cuttings from her tanktop) and defendant's known blood sample. The fourth probe gave uninterpretable results. Presley further testified that the probability for these patterns in the FBI database calculated by the product rule was one in one thousand, thereby excluding as contributors 99.9 percent of the Caucasian population unrelated to defendant.

Presley also testified that in defendant's case, one probe showed a relatively rare single-banded pattern. He explained that the FBI takes an extremely conservative approach when a single-banded allele is drawn and "literally bias[es]" the statistic in favor of a defendant. Specifically, the FBI assumes in such cases that a second band is present but not detected and that the "unseen" allele is present in 100 percent of the population, thereby producing an artificially high figure for the likelihood of a random match with someone in the Caucasian population. Consequently, the probability estimate presented to the jury in the instant case was biased in favor of defendant.

### Standard of Review

On appeal, defendant argued that the trial justice erred in permitting the jury to hear expert testimony regarding the statistical significance of DNA matches as calculated by the product rule method on the grounds that product rule calculations are inherently unreliable. The defendant did not question on appeal the general admissibility of DNA evidence.

■ It is well settled that the determination of the admissibility of expert witness testimony rests within the sound discretion of the trial justice. *State v. Capalbo*, 433 A.2d 242, 246 (R.I.1981); *State v. Anil*, 417 A.2d 1367, 1373 (R.I.1980); *State v. Benton*, 413 A.2d 104, 113 (R.I.1980). On review, this Court will not disturb a trial justice's finding on the admissibility of expert testimony absent an abuse of that discretion. *Capalbo*, 433 A.2d at 247; *Anil*, 417 A.2d at 1373.

■ In *State v. Wheeler*, 496 A.2d 1382 (R.I.1985), this Court analyzed the admissibility of expert testimony in respect to spec-

trographic voice identification and established therein the test for the admissibility of expert testimony based on novel scientific evidence. Under *Wheeler*, the trial justice must first determine whether the expert testimony is relevant. "Relevant evidence is evidence that tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence." *Id.* at 1388.

■ After deciding that the evidence is relevant, the trial justice must also consider whether the subject matter is one for which expert testimony is appropriate and must assess the qualifications of the expert witness. *Id.*

"[W]here the subject matter of the testimony is of a mechanical, scientific, professional or like nature, none of which is within the understanding of laymen of ordinary intelligence, and where the witness seeking to testify possesses special knowledge, skill or information about the subject matter acquired by study, observation, practice or experience, then such an individual's opinion may be heard as an aid to the jury in its quest to discover the truth." *Wheeler*, 496 A.2d at 1388 (quoting *Morgan v. Washington Trust Co.*, 105 R.I. 13, 17–18, 249 A.2d 48, 51 (1969)).

Finally and importantly, the trial justice must consider whether the expert's testimony will assist the jury in making its decision. *Wheeler*, 496 A.2d at 1388. In *Wheeler*, we observed that this Court has always been "open to evidence of developments in science that would tend to assist the trier of fact" and held that "helpfulness to the trier of fact is the most critical consideration" in a trial justice's decision on whether to admit expert testimony on newly developed scientific knowledge. *Id.*[2]

### DNA Evidence Admissible

The trial justice correctly held a preliminary hearing before admitting into evidence the testimony. At the conclusion of the voir dire testimony, the trial justice found that DNA product rule evidence was relevant and admissible. Presley, who was qualified as an expert during the voir dire proceedings, was then permitted to testify before the jury. On May 6, 1993, the trial justice stated fully his reasons for admitting the FBI's statistical evidence, having reserved such reasons until the jury had delivered its verdict.

■ The trial justice noted that under *Wheeler*, "helpfulness to the trier of fact" is the standard for admissibility of expert testimony in this state. The trial justice then stated that he had considered "what was being offered to the trier of fact" and had concluded that the "so-called fixed bin method utilized by the FBI is based upon accepted, well-accepted principles and that this method is reliable and is generally accepted by those in the field of genetics." Having so concluded, the trial justice permitted the jury "to be aided by the expert opinion generated by Mr. Presley." The trial justice also observed that any dispute concerning statistical probabilities "is not a dispute on admissibility of the DNA analysis but rather is a dispute which goes to the weight to be accorded the opinion testimony of the expert in the field."

Our examination of the record *sub judice* has shown conclusively that the trial justice carefully considered each of the criteria set forth in *Wheeler*. As gatekeeper, the trial justice had the duty to decide the mixed question of law and fact concerning the reliability and validity of the DNA evidence. We are of the opinion that the trial justice properly fulfilled his role as gatekeeper by admitting DNA evidence that he had determined was relevant and would assist the trier of fact. In this determination, he was not clearly wrong. *See Morrow v. Norfolk & Dedham Mutual Fire Insurance Co.*, 661 A.2d 967, 968 (R.I.1995); *Cerilli v. Newport Offshore, Ltd.*, 612 A.2d 35, 39 (R.I.1992) (determination by trial justice of mixed questions of law and fact is entitled to same deference as findings of fact of trial justice sitting without intervention of jury and thus will not be disturbed unless trial justice overlooked or misconceived material evidence or was otherwise clearly wrong).

---

2. Wheeler is consistent with *Daubert v. Merrell–Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the reasoning and guidelines of which we find helpful and illuminating.

■ This Court must always be concerned with the admission of evidence that might prove unduly prejudicial to a defendant. In this regard, we note that the FBI method of binning is conservative and gives a defendant the benefit of any doubt about the data. In the instant case, the occurrence of a single-banded allele produced an artificially high estimate of the probability of a match with someone taken randomly in the population, and thus was even more biased in favor of defendant. Moreover, we are inevitably led to the same conclusion as the trial justice in holding that the methods used to determine the statistical probabilities of a match derived from DNA analysis affect the *weight* to be accorded the DNA evidence, not the admissibility of the evidence itself, and the determination of that weight is a question for the jury. In addition, it is beyond dispute that courts routinely resolve discrepancies in expert testimony, and thus DNA evidence is not unlike other conflicting scientific evidence or medical evidence regularly presented to juries by experts. *See Cuddy v. Schiavonne,* 568 A.2d 1387, 1391 (R.I.1990); *Grimes Box Co., v. Miguel,* 509 A.2d 1002, 1004 (R.I. 1986); *Davol, Inc. v. Aguiar,* 463 A.2d 170, 174 (R.I.1983) (dealing with conflicting medical expert testimony). We conclude, therefore, that provided a defendant is afforded the opportunity to cross-examine the experts, to question the validity of their conclusions, and to disclose the potential weaknesses of the proffered DNA analyses, the results of such analyses may be presented to the jury.

Finally, we note that in the preservation and testing of DNA evidence, careful attention and proper handling of the crime sample by police and scientists are crucial in defending chain-of-custody issues and in ensuring that laboratory mislabeling and inadvertent contamination have not occurred. *Reference Manual on Scientific Evidence,* at 293. It is also critical that the laboratory carrying out the DNA analysis has demonstrated a record of proficiency and quality control sufficient to demonstrate that the tests were conducted properly with crime samples containing DNA of sufficient quantity and quality. *Id.* at 287, 291. In this regard, the NRC has noted that essential elements of forensic DNA typing include: (1) a detailed written laboratory protocol, (2) an objective and quantitative procedure for identifying the pattern of a sample, (3) a procedure for declaring a match, and (4) an understanding of the limits of DNA typing when the quantity and/or quality of the evidence sample is an issue. *DNA Technology in Forensic Science,* at 53–55.

This Court is aware of the great promise of DNA research in health care as well as the potential for abuse and misuse of genetic information. Legitimate privacy concerns continue to be raised, such as the dangers of unauthorized access to data banks that can lead to disclosure of genetic information and possible genetic discrimination by entities such as insurance companies and employers. *State v. Almonte,* 644 A.2d 295, 306 (R.I. 1994) (Lederberg, J. dissenting) (noting concerns regarding constitutional protection of privacy rights in light of information likely to result from Human Genome Project); *see generally* Philip R. Reilly, *Public Policy and Legal Issues Raised by Advances in Genetic Screening and Testing,* 27 Suffolk U.L.Rev. 1327 (1993); *DNA Technology in Forensic Science,* (National Research Council 1992). We are not persuaded, however, that such danger, in the form of undue prejudice to defendant, exists in the circumstances presented in the case at bar.

### Admissibility of the Prior Conviction Evidence

On appeal, defendant also argued that the trial justice abused his discretion when he denied defendant's motion *in limine* to exclude the introduction of evidence of defendant's prior conviction for kidnapping. The defendant contended that the conviction should have been barred because its prejudicial effect substantially outweighed its probative value and because of its remoteness in time.

■ Rule 609(b) of the Rhode Island Rules of Evidence provides that evidence of a prior conviction is inadmissible for impeachment purposes if the trial justice determines "that its prejudicial effect substantially outweighs the probative value of the conviction." It is well settled that the decision regarding the admissibility of prior convictions to impeach the credibility of a witness is a discre-

tionary matter for the trial justice. *State v. Simpson*, 606 A.2d 677, 680 (R.I.1992); *State v. Mattatall*, 603 A.2d 1098, 1117, cert. denied, 113 S.Ct. 117, 121 L.Ed.2d 74 (R.I. 1992). Furthermore, there is no fixed time limit on the use of prior convictions, but rather, "the determination of what is remote so as to create undue prejudice in a particular case remains an issue properly left to the discretion of the trial justice." *Simpson*, 606 A.2d at 680. This Court will not disturb a trial justice's finding regarding the admissibility of prior conviction evidence for impeachment purposes unless our review of the record reveals an abuse of discretion on the part of the trial justice. *Id.* at 681; *Mattatall*, 603 A.2d at 1118.

In the instant case, the trial justice noted that the evidence of prior conviction was being offered solely on the issue of truthfulness and that because the eyewitness testimony of the victim had been heard by the jury, the probative value of the prior conviction would outweigh its prejudicial impact. The trial justice later cautioned the jury that evidence of the prior convictions was to be considered solely in relation to the defendant's credibility and "what effect if any on the issue of credibility those convictions have as you evaluate the testimony of this defendant." Because the trial justice acted within his discretion when he concluded that the prejudicial effect of the evidence of a prior conviction did not outweigh its probative value, we shall not disturb his decision on this matter.

In summary, therefore, the defendant's appeal is denied and dismissed. We affirm the judgment of the Superior Court, to which we return the papers in this case.