STATE

v.

Kyle CAMPBELL.

No. 95–424–C.A.

Supreme Court of Rhode Island.

March 20, 1997.

Jane McSoley, Asst. Attorney General, Aaron Weisman, Asst. Attorney General, for Plaintiff.

Catherine Gibran, Janice M. Weisfeld, Paula Rosin, Asst. Public Defenders, for Defendant.

## OPINION

LEDERBERG, Judge.

This case came before the Supreme Court on the appeal of the defendant, Kyle Campbell, from a judgment of conviction of one count of first-degree murder. On appeal, the defendant contended that the trial justice improperly admitted into evidence the defendant's statements to the police and certain DNA evidence. The defendant also argued that the trial justice erred by denying the defendant's motion to pass the case and by refusing to instruct the jury on second-degree murder. For the reasons stated below, we deny the defendant's appeal and affirm the judgment of the Superior Court. A summary of the facts relevant to the issues that

the defendant has raised in his appeal follows; additional facts are included in the discussion of the issues.

### Facts and Procedural History

At about noon on June 4, 1993, the Providence police discovered Marta Cruz (Cruz or victim) lying dead in the bedroom of her first-floor apartment at 38 Homer Street in Providence, Rhode Island. Cruz's sister, Rosa Rodriguez (Rodriguez), occupied the basement apartment of the same house and testified at trial that she was with her sister, at approximately 10:35 that morning, when the then-seventeen-year-old defendant, who was a friend of Cruz's son, Omar, arrived at the Cruz home. Rodriguez further testified that, at approximately 11:45 a.m., she went downstairs to her own apartment, leaving Cruz alone with defendant in Cruz's apartment. According to Rodriguez, shortly afterward, she heard "a dropping noise" coming from her sister's apartment. When Rodriguez was unable to gain entry into Cruz's apartment, she summoned the second-floor occupant, Ingrid Hinojosa (Hinojosa), the owner of the house. Both women testified that, while standing at Cruz's back door, they heard the sound of a thud like someone jumping or falling from a rear window of Cruz's apartment onto the pebbled backyard. The women then went to Hinojosa's apartment and telephoned the police.

Officer William McCusker (McCusker) of the Providence police department arrived at the scene and discovered on the floor of her bedroom, Cruz's body covered in blood with a cord wrapped around the neck. The defendant was taken into police custody a short while later as he left his home with his grandfather, John Campbell.

A delinquency petition was filed against defendant and, upon a motion of the Attorney General, a waiver-of-jurisdiction hearing was held in the Family Court, pursuant to G.L.1956 §§ 14–1–7 and 14–1–7.1. Following the hearing, the Family Court waived jurisdiction over defendant, who was then held for trial as an adult in Superior Court. On November 1, 1993, defendant was charged by indictment with the murder of Cruz, in violation of G.L.1956 § 11–23–1. After hearings on the parties' pretrial motions, a jury trial commenced on March 5, 1995.

The trial justice instructed the jury only on the crime of first-degree murder, and on March 22, 1995, the jury returned a guilty verdict. On April 7, 1995, the trial justice denied defendant's motion for a new trial and imposed the mandatory sentence of life imprisonment for murder in the first degree. The defendant appealed, pursuant to G.L. 1956 § 9–24–32.

### Defendant's Statements to Police

The defendant first contended that because he was not informed, at the time he made his statements to the police, that he might be prosecuted as an adult, those statements were not made knowingly, voluntarily, and intelligently and therefore should have been suppressed.

In *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966), the United States Supreme Court imposed on police officers a bright-line rule that a suspect in police custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." The Supreme Court also held that an individual may knowingly and intelligently waive his *Miranda* rights and answer questions voluntarily or make a statement to the police. *Id.*

In *Fare v. Michael C.*, 442 U.S. 707, 724–25, 99 S.Ct. 2560, 2571–72, 61 L.Ed.2d 197, 212 (1979), the United States Supreme Court observed that the "determination whether statements obtained during custodial interrogation are admissible against the accused is to be made upon an inquiry into the totality of the circumstances surrounding the interrogation," and went on to hold that the "totality-of-the-circumstances approach is adequate to determine whether there has been a waiver even where interrogation of juveniles is involved."

This Court first adopted the totality-of-the-circumstances test in respect to ju-

venile waivers in *In re Kean,* 520 A.2d 1271, 1276 (R.I.1987), in which we held that "the validity of a juvenile's waiver of his or her rights should be evaluated in light of the totality of the circumstances surrounding that waiver." In *Kean,* we stated that the totality-of-the-circumstances test requires consideration of all of the circumstances surrounding the interrogation of a juvenile suspect, including the juvenile's age, experience, education, and intelligence, his or her capacity to understand the *Miranda* warnings and the consequences of waiver, and the presence of a parent, a guardian, or an interested adult. *Id.* at 1274–75.

On appeal here, defendant has urged this Court to replace the totality-of-the-circumstances approach with the *per se* rule set forth in *State v. Benoit,* 126 N.H. 6, 490 A.2d 295 (1985), which requires that a juvenile be warned about the possibility of a waiver of jurisdiction into adult court as a constitutional prerequisite to the admission into evidence of his or her statements to the police. We decline to do so.

The underlying purpose and "only source of legitimacy" of the *Miranda* warnings is to "dissipate the compulsion inherent in custodial interrogation," thereby protecting a suspect's Fifth Amendment right against compulsory self-incrimination. *Moran v. Burbine,* 475 U.S. 412, 425, 106 S.Ct. 1135, 1142–43, 89 L.Ed.2d 410, 423 (1986). This Court has concluded that instead of expanding the bright-line rule of *Miranda,* we would "consider the balance of interests between society's need for reasonable law enforcement as against the accused's rights to remain silent and to assert his privilege against self-incrimination," and we have attempted to "strike the balance at the point required by *Miranda* and its progeny." *State v. Burbine,* 451 A.2d 22, 29, 30 (R.I. 1982); *see also State v. Perez,* 218 Conn. 714, 591 A.2d 119, 124 (1991).

This Court also observed that "the [United States] Supreme Court in furtherance of the *Miranda* principles has never required the police to give an estimate or admonition concerning probable maximum penalties." *State v. Cline,* 122 R.I. 297, 310–11, 405 A.2d 1192, 1200 (1979). Although a knowing, intelligent,

and voluntary waiver requires that a suspect understand that his or her statements could be used against him or her in a court of law, neither *Miranda* nor any succeeding case of the Supreme Court has suggested that an interrogating officer must advise or admonish a suspect about possible methods of prosecution. We are persuaded that together the bright-line rule pronounced in *Miranda* and the totality-of-the-circumstances test enunciated in *Fare* and *Kean* strike the proper balance between society's legitimate interests in law enforcement and the accused's right to protection from compulsory self-incrimination. Moreover, the primary purpose of the *Miranda* rule is to deter governmental and police coercion that violates a defendant's due-process rights under the Fourteenth Amendment. It follows, then, that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.' " *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986) (mental condition of defendant by itself does not render a confession involuntary, absent coercive police activity).

■ In the case before us, Detective Stephen Springer (Springer) of the Providence police department testified that, before defendant was conveyed to the Providence police station, Springer read the *Miranda* rights to defendant and asked defendant whether he understood each of those rights. According to Springer, defendant responded that he understood. Springer further testified that en route to the station in a police car, he did not converse with defendant beyond ascertaining defendant's age.

At the police station, defendant was again advised of his constitutional rights, this time in the presence of his grandfather and his mother. Detective Steven Pirolli gave copies of a rights form to defendant, his mother, and his grandfather. The defendant initialed the beginning of each line of the rights form, read each line aloud, stated that he understood each enumerated right, then initialed the end of each line. The defendant then waived his rights and agreed to speak to the police. The defendant, his mother, and his grandfather signed the waiver form.

In his initial written statement to the police, defendant related that he had gone to Cruz's apartment on the way to school that morning to obtain some aspirin for his headache. According to defendant, he took the aspirin and was alone in Omar's bedroom when he heard some other people arrive at Cruz's home and enter her bedroom. Shortly thereafter, defendant left the apartment and set off for school. Upon realizing that he had left a set of keys behind, however, he decided to return to Cruz's apartment. The defendant claimed that, as he approached Cruz's house, he encountered three men, one of whom grabbed defendant from behind, while another, who was spattered with blood, swung a knife at defendant, until defendant was also covered with blood. The defendant stated that he sustained several cuts to his hand when he raised them in an effort to protect himself. According to defendant, the men argued about whether they "should have killed the bitch" and also argued about whether to kill defendant. The defendant claimed that he escaped from his attackers and made his way home, where he asked his grandfather for a ride to the hospital for treatment of the lacerations on his hands. The defendant admitted that he did not phone the police to report what had occurred outside Cruz's home.

In the meantime, the Providence police examined the murder scene and recovered several pieces of evidence, including a floral-print pillowcase with the bloody impression of a shoe print. The police also obtained a search warrant for defendant's residence and seized several items, including a pair of jeans and a bloodstained white T-shirt from the laundry area in the basement, and a pair of black shoes from defendant's bedroom. During a break in questioning, Detective William Carroll (Carroll), who had made a visual comparison of the recovered evidence, indicated to defendant that the shoe seized from his bedroom could have made the bloody imprint on the pillowcase taken from Cruz's bedroom. Confronted with this information, defendant told Carroll that he had stabbed Cruz.

The defendant then gave a second written statement to the police in which he related

that he had stabbed Cruz in the chest with a knife from her kitchen, wrapped a cord around her neck, and left the house through a window. The defendant told police that Cruz had never struck him and that he did not know why he had killed her.

The defendant's mother and grandfather were present when defendant gave his first statement to the police, and his mother also signed the first statement. Every answer in defendant's first and second statements was initialed by him, and every page of both statements was signed by defendant. The defendant's grandfather was present while the second statement was given, and he also signed it as a witness.

In determining the admissibility of defendant's statements, the trial justice applied the totality-of-the-circumstances test and considered all the relevant factors surrounding defendant's interrogation. He noted that defendant was a seventeen-year-old high school student who, although without prior experience with the authorities, appeared "calm" and "self-possessed" during his interrogation. He also observed that defendant was given his *Miranda* rights twice—at the time of his arrest and again at the police station; that defendant had access to his mother and his grandfather, who were present when defendant was advised of his rights at the station and present when he waived those rights; and that defendant, as well as his mother and grandfather, signed the written waiver form. The trial justice further found that defendant was intelligent enough to fully understand his rights and "the consequences of the interrogation process he was going through" and determined that there was "nothing in the evidence to even hint that defendant did not understand his rights and the consequences of his statements." The trial justice also concluded that police followed a "meticulous procedure" in delivering *Miranda* warnings to defendant and that defendant's interrogation was "fair and thorough without any suggestion of threat or coercion." The trial justice found by clear and convincing evidence that "notwithstanding the age of the defendant, based upon the facts reviewed by the Court, [defendant] knowingly, intelligently and voluntarily

waived his right to have counsel present and waived his right not to incriminate himself." The trial justice specifically found that the failure of the police to inform defendant about the possible waiver to adult court "did not impact upon the voluntariness of his written and oral statements."

■ The issue on appeal is whether defendant's Fifth Amendment privilege against compulsory self-incrimination has been violated such that his confession was rendered involuntary. In *Miller v. Fenton*, 474 U.S. 104, 110, 106 S.Ct. 445, 449, 88 L.Ed.2d 405, 411 (1985), the United States Supreme Court held that the "voluntariness" of a confession is a legal question. This Court will review *de novo* legal questions and mixed questions of law and fact insofar as those issues impact on constitutional matters, pursuant to *Ornelas v. United States*, 517 U.S. ——, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). Our prior cases followed a standard of review on mixed questions of law and fact that has now been declared erroneous in *Ornelas*. In elucidating its rationale for directing an appellate review *de novo* on such mixed questions of law and fact as reasonable suspicion and probable cause, the Supreme Court stated that "[a] policy of sweeping deference" could allow constitutional issues to be decided " '[i]n the absence of any significant difference in the facts,' * * * [depending] 'on whether different trial judges draw general conclusions that the facts are sufficient or insufficient' " to decide a constitutional issue. *Id.* at ——, 116 S.Ct. at 1662, 134 L.Ed.2d at 919. The Supreme Court concluded that "[i]ndependent review is therefore necessary if appellate courts are to maintain control of, and to clarify the legal principles." *Id.*

Our careful *de novo* review of the record before us revealed ample evidence to support the trial justice's finding that defendant's waiver was knowing, intelligent, and voluntary and that defendant fully understood his rights and the consequences of waiving those rights. Consequently, we hold that the trial justice properly denied defendant's motion to suppress his statement.

### Trial Justice's Refusal to Pass the Case Because of Loss of Evidence

John Krolikowski, M.D. (Krolikowski), an expert in forensic pathology and the deputy chief medical examiner for the State of Rhode Island in June 1993, testified that he examined the cuts on defendant's hands at the police station on the day of the murder, that he and his assistant photographed the lacerations, and that he made a hand-drawn diagram of defendant's hands "in the event there was a problem with the photography."

The defendant moved to pass the case when the diagram of his hands and all but one photograph were misplaced and not available at trial. The trial justice found that defendant had failed to meet the burden imposed by this Court in *State v. Garcia*, 643 A.2d 180 (R.I.1994), and refused to pass the case "on the remote possibility that a diagram and/or photos labeled by [defendant's] own words as irretrievably lost might be found by the use of other personnel." The trial justice reasoned that there would be no benefit to defendant if the case were passed because all parties agreed that the evidence was "irretrievably lost."

■ On appeal, defendant argued that the trial justice erred by refusing to pass the case because the misplaced evidence might have been of exculpatory value to defendant, and could have constituted a critical part of defendant's defense. It is well settled that the decision to pass a case and declare a mistrial lies within the sound discretion of the trial justice and will not be disturbed on review unless that decision was clearly wrong. *State v. Brown*, 528 A.2d 1098, 1103 (R.I.1987).

In *State v. Garcia, ante*, this Court addressed the question of whether the due process rights of a defendant in an arson case were violated by the destruction of certain notes compiled by the fire investigator. We observed that together, *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413, 419 (1984), and *Arizona v. Youngblood*, 488 U.S. 51, 55, 109 S.Ct. 333, 336, 102 L.Ed.2d 281, 287 (1988), "established a tripartite test to determine whether a defendant's due-process rights have been infringed by the failure of law

enforcement personnel to preserve evidence." *Garcia*, 643 A.2d at 185. "This test requires a defendant to establish that the proposed evidence possesses, first, 'an exculpatory value that was apparent before the evidence was destroyed, and [second, is] of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id.* (quoting *Trombetta*, 467 U.S. at 489, 104 S.Ct. at 2534, 81 L.Ed.2d at 422). "Third, a defendant also must demonstrate that the failure to preserve the exculpatory evidence amounted to bad faith on the part of the state." *Id.* (citing *Youngblood*, 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289; *Trombetta*, 467 U.S. at 488, 104 S.Ct. at 2533, 81 L.Ed.2d at 422).

This Court earlier held in *State v. Lewis*, 467 A.2d 1387, 1388 (R.I.1983), that the loss of evidence did not deprive that defendant of his right to a fair trial because there was no indication that the state had acted in bad faith or had been negligent, nor were the lost items difficult for the jury to visualize. Moreover, the defendant was not prejudiced by the state's inability to present the evidence inasmuch as strong evidence existed against him that was independent of the lost evidence. In addition, we held in *State v. Mastrofine*, 551 A.2d 1174, 1178 (R.I.1988), that, even if the loss of certain photographs of the defendant was the result of the state's negligence, dismissal of the indictment against the defendant was not warranted because the strength of the state's other evidence greatly outweighed any prejudice suffered by the defendant.

■ Our review of the record in the case before us revealed no evidence of bad faith on the part of the state. Even if the state were negligent in losing the photographs and the diagram, it is our conclusion that ample expert medical testimony about the nature of the wounds, including expert testimony by Krolikowski that the lacerations were consistent with a defensive type of wound, constituted an adequate substitute for the lost evidence. We further note that the state did not dispute the existence of the wounds, and in fact, Springer testified that defendant's hands were lacerated at the time of his arrest.

Moreover, we are persuaded that other evidence of defendant's guilt far outweighed any prejudice suffered by defendant following the loss of the photographs and the diagram. The evidence presented at trial included defendant's own statements to the police, expert medical testimony on the cause of Cruz's death, expert testimony on the results of DNA analyses, and the testimony of several other individuals who had gathered and/or examined evidence. For instance, Detective Walter Williams of the Providence Bureau of Criminal Investigation testified that a bloody palm print on a lamp base recovered from Cruz's bedroom positively matched the known palm print of defendant. Special Agent Gary Kanaskie (Kanaskie) of the Federal Bureau of Investigation (FBI), an expert in the area of shoe-print and tire-print impressions, testified that owing to the absence of any uniquely identifying marks on the soles of defendant's shoes, he could not state that defendant's shoes had "positively" left the impressions on the floral pillowcase recovered from Cruz's bedroom. Kanaskie did, however, opine to a reasonable degree of scientific certainty that the pair of shoes seized from defendant's bedroom corresponded in size and design with the shoe impressions on that pillowcase.

We conclude, therefore, that the trial justice did not abuse his discretion in declining to pass the case, nor was he clearly wrong in so doing.

### Admission of DNA Evidence

In the instant case, a voir dire hearing was held on defendant's motion *in limine* to suppress certain DNA evidence. After hearing testimony from expert witnesses, the trial justice ruled that the DNA evidence was admissible, but limited testimony regarding the statistical significance of any DNA matches to those generated using the conservative ceiling-principle technique.[1]

---

1. See *State v. Morel*, 676 A.2d 1347, 1352–53 (R.I.1996), for a discussion of ceiling-principle data versus product-rule data.

Agent Linda Harrison (Harrison) of the FBI, who qualified as an expert in microbiology and DNA analysis, testified that the DNA profile from blood stains, designated as (Q–22), on the white shirt seized from the laundry area at defendant's home visually and numerically matched the DNA profile from a known sample of the victim's blood (K–1) on three out of four probed sites, namely, D17–S79, D1–S7, D4–S139.[2] Harrison further testified that because the bands were "real faint" at the fourth probed site (D2–S44), she acted conservatively and did not use the fourth autorad in her interpretation, even though the information on that autorad revealed "nothing inconsistent with the information on the other three autorads." David Rand, Ph.D. (Rand), an expert witness in biology and population genetics, testified that, using the ceiling principle, he calculated the probability that any randomly selected individual possesses a DNA profile matching that of the victim at between 1: 5863 and 1: 9461.[3]

Harrison also testified that the vial containing Cruz's known blood sample had leaked en route to the FBI laboratory, but, she asserted, the leaked blood was contained in the plastic bag that held the vial and there was no evidence of any blood leakage anywhere but inside the plastic bag. She further testified that although the white shirt in question was not listed in the transmittal letter sent from the Providence police to the FBI laboratory, the shirt was definitely in an envelope in the box of evidence forwarded to her by the Providence police and no blood from the leaking vial had been transferred to the envelope containing the shirt. We note that defendant did not dispute that the shirt belonged to him and that it was recovered from his home on the day of the murder.

Harrison also testified that the DNA profiles from a purple "pullover" sweater (Q–10) taken from Cruz's bedroom and the right shoe of the pair (Q–5) seized from defendant's bedroom matched the DNA profile of Cruz's known blood sample at one genetic locus (D17–S79). No statistical analysis was performed to determine the likelihood that a randomly selected person would have DNA that was consistent with Cruz's DNA profile at this single locus. Harrison explained that the FBI calculates statistics only in cases in which a match at three genetic loci is found.

On appeal, defendant argued that the trial justice erred by admitting the evidence of the two single-probe matches because no statistics were presented on the likelihood of such matches occurring randomly. At the voir dire hearing, Rand testified that because "K–1, Q–5, Q–10, and Q–22 all show statistical evidence for a match at this one locus [D17–S79] where there is information for all of the samples and the other two probes [D1–S7 and D4–S139] show additional information for K–1 and Q–22, the calculations would be virtually identical if done for the one locus that was informative for all samples or the three loci that were informative for K–1 and Q–22." Rand further stated that the sample for which the FBI submitted "information on three probes was deemed to be a match or identical to the sample for which only one probe of information was available," and that because "the evidence available indicates that [the samples] are from the same source, the same human individual, then providing the complete data of all three probes is a more complete way to describe the data and the evidence available."

On the basis of the expert testimony of Harrison and Rand, we are persuaded that this statistical evidence of the probability of DNA matches affects the weight to be accorded DNA evidence rather than the issue of the admissibility of that evidence. And this Court has held in *State v. Morel*, 676 A.2d 1347, 1356 (R.I.1996), that the determination of the weight of DNA evidence is a question for the jury. Moreover, our review of the record revealed that defendant in this

---

2. See *Morel*, 676 A.2d at 1351, for a definition and description of the role of "probes" in DNA analysis.

3. At the pretrial hearing, Harrison testified that, when she used the product-rule method, the probability of such a random match was 1:87,-000 within the Black population, 1:180,000 within the Caucasian population, and 1:44,000 within the Hispanic population. In *Morel*, 676 A.2d at 1355–56, we held that product-rule data is admissible at trial.

case was "afforded the opportunity to cross-examine the experts, to question the validity of their conclusions, and to disclose the potential weaknesses of the proffered DNA analyses," essential requisites that we propounded in *Morel.* *Id.* Hence, we hold that the trial justice properly admitted the results of the DNA analyses into evidence in this case.

■ On appeal, defendant also contended that the trial justice erred in declining to give any jury instruction about the DNA evidence. Because all the information in defendant's requested instruction reached the jury through the testimony of the expert witnesses, we conclude that there was no error in the trial justice's refusal to give that instruction.

### Trial Justice's Refusal to Instruct Jury on Second–Degree Murder

■ The defendant contended that the trial justice erred by refusing to instruct the jury on the crime of second-degree murder as a lesser included offense of first-degree murder. It is well settled that "[w]hen the evidence supports a possible verdict on a lesser included offense, the defendant is entitled—and the trial justice is required—to instruct the jury on that lesser included offense." *State v. Messa,* 594 A.2d 882, 884 (R.I.1991) (citing *State v. Hockenhull,* 525 A.2d 926, 930 (R.I.1987)). An instruction on a lesser offense is not necessary, however, "when such a charge is wholly unsupported by the evidence." *State v. Figueras,* 644 A.2d 291, 294 (R.I.1994) (citing *State v. Austin,* 462 A.2d 359, 366 (R.I.1983)).

■ Because defendant in this case was on trial for first-degree murder, "he was also on trial for all lesser-included offenses and, thus, was simultaneously on trial for murder in the second degree." *State v. Grabowski,* 644 A.2d 1282, 1286 (R.I.1994). The distinction between first-degree and second-degree murder is that first-degree murder "requires proof of premeditation of more than a momentary duration and proof of deliberation whereas second-degree murder does not." *Id.* at 1285. Accordingly, we have held that "[i]f that premeditation is more than momentary, the murder is in the first degree and no

charge on second degree murder is necessary; if it could be less, then the offense may be murder in either the first or second degree, and a charge on both must be given." *State v. Myers,* 115 R.I. 583, 591, 350 A.2d 611, 615 (1976).

■ In this case, John DuVally, M.D. (DuVally), presented expert medical testimony about the circumstances surrounding Cruz's death. According to DuVally, Cruz sustained multiple stab wounds and multiple blunt-trauma wounds, such that her body was covered with approximately fifteen to twenty lacerations, bruises, or contusions. DuVally opined that, although either the stab wounds or the blunt trauma wounds alone were sufficient to cause Cruz's death, the defensive wounds on Cruz's hands indicated that she was alive when she was stabbed, and the blunt force wounds would not have killed Cruz "instantly or quickly." Because the ligature would have caused Cruz to "slip into unconsciousness in less than a minute," DuVally concluded that this was the last injury inflicted on Cruz and that the immediate cause of Cruz's death was asphyxiation that was due to strangulation by ligature, in this case an electrical cord from a lamp in the victim's bedroom.

Our review of DuVally's testimony has led us to the ineluctable conclusion that Cruz was viciously murdered in a manner that demonstrated more than momentary intent. Furthermore, we have gleaned no evidence in the record before us that has suggested that the defendant did not act with premeditation of more than a momentary duration. Because there was no evidence upon which a second-degree-murder conviction could rest, the defendant was not entitled to the requested instruction. Consequently, we hold that the trial justice properly refused to instruct the jury on second-degree murder.

In summary, therefore, the defendant's appeal is denied and dismissed. We affirm the judgment of the Superior Court, to which we remand the papers in this case.