DECISION
Two matters are before the Court on motions filed by the Defendant, Jeremy Motyka. In the first motion-Defendant's Motion In Limine — the Defendant seeks to have excluded from trial any evidence referencing "DNA evidence, analysis, and test results arrived at" in the case at hand.
Secondly, the Defendant seeks to suppress any alleged confession and/or alleged statement made to the Rhode Island State Police on May 31, 1999, June 3, 1999, as well as any statement given to the police on June 24, 1999.
 I. Motion in Limine-Admissibility of DNA Scientific Evidence Facts
Jeremy Motyka is accused of murdering and raping Angela Spence Shaw. Before his formal arrest on June 24, 1999, the Defendant had voluntarily accompanied the police to Saint Ann's Hospital in Fall River, Massachusetts on June 9, 1999, where blood was drawn from Mr. Motyka and later subjected to deoxyribonucleic acid (DNA) testing. It is that testing and its attendant results which, according to the State, links the Defendant to this murder and rape. Mr. Motyka now seeks to exclude that evidence.
 Discussion
Pursuant to the Rhode Island Supreme Court's seeming dictates in State v. Morel, 676 A.2d 1347 (R.I. 1996), State v. Quattrocchi, 681 A.2d 879, (R.I. 1996), and DiPetrillo v. Dow Chemical Co., 729 A.2d 677 (R.I. 1999), this Court conducted a voir dire preliminary hearing from December 4, 2000 through December 15, 2000 to determine whether the State's proffered scientific evidence and expert witness testimony would be admitted at the time of Defendant's trial. To meet its preponderance of evidence burden of proof, which is required in order to advance its claim of the trial admissibility of this evidence, the State presented several witnesses to explain the general science of DNA and its acceptability in the scientific community as well as its use and applicability to the case before the Court. In addition, the State submitted evidence regarding the DNA PCR testing methodologies and procedures utilized in Defendant's case and their similar acceptability in the scientific community. Moreover, in order to link Jeremy Motyka to Angela Spence Shaw's murder and rape, the State adduced evidence of the science of the statistical calculations and the matching procedure which was applied to the tested blood, tissue, and fluid DNA samples taken from Angela Spence Shaw and 23 others.
When the admissibility of such evidence is legitimately challenged by a defendant, it is the court's duty and responsibility to serve as an evidentiary gatekeeper deciding mixed questions of law and fact to insure that the purported scientific evidence is valid, reliable or trustworthy, relevant, and of assistance to the triers of fact in reaching a decision. Morel at 1355.
The analysis in this case begins with the Defendant's specific challenge, which according to Mr. Motyka's motion is as follows: "That a pre-trial evidentiary hearing be conducted to determine the reliability, relevancy and admissibility of the forensic applications of DNA evidence in general and as applied in this case." Thus, the Court interprets this request to be a challenge to the general science of DNA itself, the scientific testing procedures for analyzing collected forensic samples, and the statistical analytical methods used for giving the results some useful meaning. Further, the Defendant's motion contests the applicability of the scientific evidence herein to his particular criminal prosecution.
The general need for an overall legal admissibility analysis of general scientific information is premised upon the notion that the offered scientific evidence is new, "novel," complex, and/or controversial, and must be subjected to intense and heightened judicial scrutiny before it can be deemed reliable enough for use at trial. Historically, our courts have adopted as an overall philosophical working principle that Rhode Island is open to evidence of developments in science that would tend to assist the trier of fact, and that Rhode Island has never been hostile to the proof of fact by evidence relating to scientific tests or experiments. State v. Wheeler, 496 A.2d 1382 (R.I. 1985), Powers v. Carvalho, 109 R.I. 120, 281 A.2d 298 (1971).
With respect to the general DNA issues raised by Jeremy Motyka herein, this Court would note that nearly 70 years have passed since the discovery of DNA's existence and since the mystery of its purpose began to unfold. At this point on the historical spectrum it can hardly be said that DNA can or should be considered a novel or controversial body of science. What once was novel has now become the exciting norm. Articles about DNA use and experimentation appeared near daily in The Providence Journal during the duration of this preliminary hearing, i.e. "DNA Study Supports Theory Modern Humans Arose In Africa," The Providence Journal, Thurs. Dec. 7, 2000. The science is now routinely and extensively used for such purposes as paternity testing, gene therapy, and mass victim disaster and soldier identification. It is the substance of the just completed Human Genome Project. Federal, state and private forensic DNA testing laboratories now exist throughout the United States, including Rhode Island and indeed, throughout the world. Whereas the applicable uses of DNA information and genetic science continue to evolve, the basic discipline knowledge has without question been most firmly established. As the Supreme Court noted in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), at some point scientific principles and discoveries cross the line between experimental and demonstrable stages.
Speaking for our State Supreme Court in Morel, Justice Lederberg laid out the science of DNA as clearly and succinctly as it can possibly be explained in layman's terms. In doing so, she presented her in-depth DNA recitation as a scientific given, not as some questionable or controversial scientific theory. Continuing on with her decision, the court then used this DNA factual recitation to inform the remainder of its opinion. Our Supreme Court is in step with other state and federal courts which have recognized the valid use of DNA evidence. In an article written by Justice Joseph T. Walsh of the Delaware Supreme Court entitled "Keeping the Gate: The Evolving Role of the Judiciary in Admitting Scientific Evidence," Judicature, Nov-Dec, 1999 Vol. 83, No. 3, p. 140., he stated, DNA matching evidence, once viewed as controversial, is now readily accepted for identification purposes. The scientific basis for this evidence is now so well established that its admissibility is sanctioned by statute in many jurisdictions with only the projection of a random match left to expert opinion. The current state of the law seems to sanction the general scientific basis for DNA identification by permitting only the challenge to individual results.
This court finds that based on the Morel case and its Rhode Island progenies, to wit, State v. Gabriau, 696 A.2d 290 (R.I. 1997), and State v. Campbell, 691 A.2d 564 (R.I. 1997), the Rhode Island Supreme Court has previously spoken for this jurisdiction in accepting the validity and reliability of DNA scientific principles within the broad scientific community. Acknowledging its relevancy for trial purposes, our Supreme Court has, thus, joined those other jurisdictions which liberally sanction the general introduction of this evidence.
Moreover, based on the Morel, Gabriau, and Campbell cases, this Court reaches a similar conclusion with respect to the DNA Restriction Fragment Length Polymorphism (RFLP) analysis and the Product Rule Technique statistical calculation principle, both of which were likewise discussed at length by Justice Lederberg in Morel. Clear in her discussion is the recognition of the overall relevancy of this body of science for forensic investigations and criminal trial purposes. Subject to the ever present requirement that a scientific procedure be properly performed and applied in any given case, this Court finds that like the general science of DNA, our Supreme Court has already sanctioned the overall validity, evidentiary admissibility, and relevancy of these two additional scientific principles. As a general matter, RFLP testing and Product Rule Calculation principles are not novel scientific theories in need of heightened judicial scrutiny at this preliminary hearing level.
The requirement of a preliminary hearing is not appropriate . . . however if "an expert's expertise is so common and well understood that the necessary foundation can be laid while qualifying the witness as an expert during the trial, on the stand, in front of the jury. There may be no need for a separate hearing. If the expert's evidence is not novel, then the foundation need not be novel either." 29 Creighton L. Rev. at 948.
The impact of Daubert in such a case "may be inert-the [trial] court may be able to take judicial notice of the reliability of the expert's theory and methodology, the foundation may be able to be laid in front of the jury, or no one will raise the issue." DiPetrillo at 688 (quoting 29 Creighton L. Rev. at 949).
Like so many other experts who routinely testify before the court-physicians, auto mechanics, psychiatrists, engineers, architects, computer scientists, building contractors, and the list goes on and on-there comes a time in the advancement of a science when for purposes of criminal and civil trials, that unless something odd or extraordinary is gleaned from pre-trial discovery and investigation (i.e., through the Defendant's review of the expert's report, lab notes, written protocols, consultation with other experts or through the independent testing of collected evidence, or through pre-trial criminal depositions pursuant to Rhode Island Rules of Criminal Procedure 16(f)) that would make a purported expert's opinion somehow legally unworthy of submission to a jury, then testing the opinion of a properly qualified expert should be left to deft cross examination before the jury, presentation of independent contradictory expert opinion, or voir dire examination of specifically identified evidentiary problems at the time of trial.
Our Supreme Court has already given guidance as to the scientific substantive and procedural pitfalls that should alert trial counsel when wading through DNA pretrial discovery. The Morel court lists for guidance certain criteria. Is there any indication in the discovery material that would suggest improper preservation or testing of samples? Was there a proper chain of custody or suggestions of possible mislabeling and inadvertent contamination? Has the laboratory demonstrated a record of proficiency and quality control, and were the samples of sufficient quantity and quality? Does the lab have detailed written protocols, and objective and quantitative procedure for identifying and declaring a match? Morel at 1356. Further guidance can be found in U.S. v. Beasley, 102 F.3d 1440 (8th Cir. 1996), in which DNA evidence was used to gain the convictions of two men on robbery and firearm charges.
In every case, of course, the reliability of the proffered test results may be challenged by showing that a scientifically sound methodology has been undercut by sloppy handling of the samples, failure to properly train those performing the testing, failure to follow the appropriate protocols, and the like. Beasley at 1448.
Because DNA science is no longer new or novel, and absent some objective pre-trial suggestion of an expert qualification problem, or scientific testing methodology error or ineptitude, or some other flaw in the offered evidence, this Court believes, at present, that our case law does not mandate a lengthy preliminary hearing to determine the possible use or exclusion of otherwise ordinary scientific evidence. Rather, if the problems flagged by Morel, as noted above, are able to be sufficiently explored on cross examination, then the issue becomes one of the weight of the evidence rather than its admissibility.
Nevertheless, out of an abundance of caution that what this particular trial justice deems well established and routine DNA science might later be viewed as judicially unsettled terrain in Rhode Island, and because this case does present to this trial court one scientific issue that our Supreme Court has not yet specifically addressed, the Court proceeded with a hearing on Defendant' Motion in Limine.
In his motion, Mr. Motyka more specifically requests that this Court exclude evidence of PCR testing and its results.
It was the Polymerase Chain Reaction (PCR) DNA testing methodology that was used in Mr. Motyka's criminal investigation to extract and analyze forensic samples from Ms. Spence Shaw and 23 others including the victim. The Defendant argues that although the RFLP testing method may have the Supreme Court's approval, the use of this PCR testing makes this case issue one of first impression in Rhode Island requiring DiPetrillo, Morel, and Quattrocchi judicial scrutiny. It is the State's position that because Rhode Island case law affirmatively establishes the admissibility of DNA evidence, and speaks of DNA analysis in general and not of RFLP analysis exclusively, no such preliminary scrutiny is called for. The State contends that in many different scientific areas, testing techniques are in constant evolution, generally and hopefully for the better, and that every such normal advancement should not be branded as new and in need of a preliminary hearing to establish its trial admissibility. Citing Morel, the State asserts, "provided that a defendant is afforded the opportunity to cross-examine the experts, to question the validity of their conclusions, and to disclose the potential weaknesses of the proffered DNA analyses, the results of such analyses may be presented to the jury." Morel at 1356.
PRC testing, although never discussed by our Supreme Court, is not new in the scientific world or in trial usage. An explanation of DNA and PRC testing can be found in 1996 National Research Council (NRC), The Evaluation of Forensic DNA Evidence, which the State and the Defendant referred to throughout this hearing, and which the State's witnesses recognized as authoritative and useful. According to the NRC's publication, PCR-based test-evidence had been introduced into evidence in 44 cases and had been evaluated in 25 admissibility hearings in 20 different states. NRC at 177-178, note 30. In the 1996 federal court case of U.S. v. Beasley, 102 F.3d 1440 (8th Cir. 1996), that court, in footnote number 4, cited 17 cases from around the country in which PCR evidence was admitted, and where the introduction of PCR DNA testing was allowed. After reviewing those cases, the Beasley Court concluded,
Although we appear to be the first federal court of appeals to examine the PCR method of DNA typing, we note that a number of state appellate courts have examined the PCR method and the vast majority of them have sustained the admission of DNA evidence derived from the PCR method. We now join their ranks. Beasley at 1447.
Later in its decision, the court added: "We believe that the reliability of the PCR method of DNA analysis is sufficiently well established to permit the courts of this circuit to take judicial notice of it in future cases." Beasley at 1448.
An example of other jurisdictions which have accepted PCR testing is as follows. In a 1997 Massachusetts case, Commonwealth v. Fowler, 685 N.E.2d 756 (Ma. 1997), PCR testing was the DNA method utilized to tie the defendant to a rape of a two year old child. In 1998, the New Mexico Supreme Court ruled, "We hold that PCR evidence is admissible in New Mexico Courts." State v. Stills, 957 P.2d 51, 59 (N.M. 1998). In 1998, the New Hampshire FBI PCR testing evidence was admitted by the court. U.S. v. Shea 159 F.3d 37 (1st Cir. 1998). PCR techniques were generally accepted within the scientific community of forensic geneticists. US. v. Gaines, 979 F. Supp. 1429 (SD Fla. 1997).
In the context of this preliminary hearing, the State called to the stand four individuals whose professions involve routine DNA testing and analysis. The Court heard from Robin Smith, Supervisor of the forensic biology section of the RI Department of Health Laboratories, Dr. Kevin McElfresh, Vice President and Director of Research at The Bode Technology Group, Inc., (Bode) in Sterling, Virginia, and Adjunct Professor of Biological Sciences at Florida International University in Miami, Florida, Biologist Suzanna Ulery, a laboratory analyst for The Bode Technology Group, and Lisa M. Barnes, a Scientist in the Pharmacogenetics division in Clinical Pharmacology at Novartis Pharmaceuticals, Inc. in Gaithersburg, Maryland and formerly a Research Biologist and Forensic Analyst at the Bode Technology Group from 1997 to 1999. These witnesses further explained DNA science, its overall uses, and more specifically how it was utilized in this case. The Defendant did not call any expert witnesses of his own but instead, primarily relied upon cross examination of the State's witnesses to counter the State's burden. In listening to the testimony of each of the State's witnesses, the Court found their testimony clear, consistent, credible, persuasive, and not refuted.
Assuming judicial notice inappropriate, State v Wheeler and State v. Morel, dictate that this Court conduct a three prong analysis before allowing the introduction of this scientific evidence at Mr. Motyka's trial. First, is the evidence proffered by the State relevant within the context of the case before the Court. Second, is the subject matter one for which expert testimony is appropriate and whether the particular expert(s) is qualified to render the opinion. Third and most importantly, will the evidence be helpful to the trier of fact.
 A) Relevant Evidence
At the threshold, "Relevant evidence is evidence that tends to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would have been without the evidence" Wheeler at 1388.
The State's basic relevancy argument can be stated quite simply. In the course of investigating Angela Spence Shaw's rape and murder, forensic samples were gathered and forwarded to the state lab and later to the Bode Lab for DNA testing. As a result of this scientific testing utilizing PCR testing methodology, and then applying those results to scientific statistical analysis, the Defendant was determined to be the one in 1.77 quintillion source of the foreign DNA material found within the vaginal cavity of the victim, and therefore, is Angela Spence Shaw's rapist and killer. Were the State to produce credible evidence to a jury in support of this theory of criminal culpability, then little more would need be proven for a jury to find the Defendant guilty. The relevancy is apparent.
Yet going beyond this theoretical relevancy argument, what is fundamental to a more practical relevancy analysis required under DiPetrillo is whether the scientific DNA PCR testing method in Mr. Motyka's case is reliable. For it is axiomatic that non reliable evidence is by definition not relevant evidence and consequently, not admissible evidence. In spite of the jurisdictions across the country that have carefully scrutinized DNA PCR testing, the Defendant challenges the soundness and reliability of this methodology.
Dr. McElfresh, who was tendered and accepted by the Court as an expert in both PCR DNA testing and in population genetics, who has been accepted as an expert in at least 450 other court rooms, and who has performed thousands of such tests, characterized this methodology as "State of the Art." In response to the Court's question "Do you have any idea, doctor, as to how many laboratories, either in the United States or even worldwide, use PCR analysis?" Dr. McElfresh responded:
 If it's just laboratories using PCR analysis, I would imagine that it's thousands of laboratories. PCR in the biotechnology field for Pharmacogenetics is widespread. It's like having a standard screwdriver in your toolbox if you're a handyman. This is one of the standard technologies used in the industry.
 And it's so important, it had such a revolutionary effect on the work that we do, is why it was a awarded a Nobel Prize actually as quickly as it did. The man who developed PCR, Gary B. Mullis, was awarded the Nobel Prize (in chemistry, 1993) for developing this at a relatively unknown speed. Typically many decades go by to prove the worth of a particular technology, but PCR was so impressive that the Nobel committee awarded this within ten years.
Dr. McElfresh went on to say,
 In forensic testing there may remain one, or a few laboratories that still do RFLP, but that's more a function of their funding and resources to make the conversion. It is clear, based on the work and the material done in the community now, that PCR STR is the only testing being done.
Consistent with Dr. McElfresh's testimony, Robin Smith, supervisor of Rhode Island's forensic biology laboratory, whom this Court qualified as an expert in PCR DNA analysis, and who has been similarly qualified by at least five other Rhode Island courts, indicated that after speaking with the FBI several years ago about national scientific trends in DNA testing, she decided to abandon RFLP testing for PCR methods. Moreover, she is in the process of soon bringing on line in Rhode Island the more advanced PCR/STR testing used by Bode in this particular case. She too proclaims the reliability of PCR testing and its wide acceptance in the scientific community. The Court notes that the Defendant presented no independent expert evidence during this hearing that would rebut these views, nor were the State's witnesses willing to concede any unreliability of this testing method if properly performed.
Moreover, in support of its position that this testing methodology has wide range acceptance in the appropriate scientific field, the State also presented evidence through the testimony of its four witnesses that the PCR DNA testing procedure has been tested, subjected to peer review and publication, and falls within an acceptable error rate. Dr. McElfresh testified about the yearly scientific conferences (The International Symposium on Human Identification, the Hilton Head Meetings, the Cambridge meetings) at which professionals working in the DNA area give lectures, present papers, and have dialogue about the science, its advancements, and its problem areas. He indicated that web sites (i.e. The National Institute for Standards and Technology) flourish about DNA and the various testing techniques, and that much has been published about this subject area. Dr. McElfresh, through his research, writing, presentations, and teaching, has personally contributed his unique professional voice to this broad field of DNA scholarship. Furthermore, both Dr. McElfresh and Ms. Smith testified about the PCR validation studies conducted by the manufacturers of the various PCR testing products utilized herein, to wit, the PMplusDQA1 typing kit manufactured by Biosystems, and the PowerPlex 1.1 and 1.2 kits manufactured by Promega, and the particularized self validation studies conducted by their respective laboratories for use of these kits. Both presented to the Court the written protocols used in their respective labs to insure quality control, contamination prevention, and security breaches. Each described the procedures in place for the proper segregation, preservation and handling of specimens.
Additionally, evidence was presented about the software and hardware utilized in the testing process (the Hitachi FMBIO II Fluorescence Imaging System, the Macintosh G-3 computer, Microsoft Excel Software, and the Thermal Cycler and its software) and the proper use of same in test performances.
Moreover, testimony was presented about the specialized training given to lab analysts, the routine proficiency testing of these specialists, and each lab's procedure for double and triple checking a particular analyst's test results, be they results which are deemed inclusive, exclusive, or inconclusive.
Additionally, the Bode Lab is accredited by the National Forensic Science Technology Center in Florida and by the American Society of Crime Laboratory Directors (ASCLAD) and DNA advisory Board guidelines, meaning that it has been subjected to additional and particularized professional scrutiny for quality control.
Based upon the above analysis the Court finds that the scientific information which the state seeks to introduce at trial is sound, reliable, directly related to the trial issues herein, and therefore meets the legal test for relevancy.
 B) Appropriateness of Expert Testimony
As to appropriateness of the expert testimony and the qualification of the expert witness:
 [W]here the subject matter of the testimony is of a mechanical, scientific, professional or like nature, none of which is within the understanding of laymen of ordinary intelligence, and where the witness seeking to testify possesses special knowledge, skill or information about the subject matter acquired by study, observation, practice or experience, then such an individual's opinion may be heard as an aid to the jury in its quest to discover the truth. Morel at 1355.
In the year 2001, DNA is not new or novel within the scientific community. And whereas the average person has heard "something" about forensic DNA analysis, if from nothing else, than the high profile criminal case of State of California v. O.J. Simpson, the specific mechanics of DNA profiling procedure and its lexicon are clearly not within the domain of the "every man's" general knowledge or language usage. It is complex information involving sophisticated and somewhat difficult concepts. Even with extensive pre-hearing reading and preparation, following the testimony of the State's scientists required intense concentration by this Court. The four testifying witnesses, all scientists of some nature, clearly possess unique professional knowledge unknown to the ordinary individuals, which they acquired through their education, training, and experience. Moreover, each scientist testifying demonstrated a firm and highly proficient grasp of the information required in their respective fields of knowledge. The DNA evidence in this case is key to the State's ability to secure a conviction against Mr. Motyka. If presented properly, it would be of utmost assistance to the jury in its quest for the truth.
 C) Helpfulness To The Jury
Again, the DNA evidence in this case is the linchpin of the State's prosecution of Jeremy Motyka. From the State's perspective, it is critical that this evidence be admitted. Given the public's lack of familiarly with the detailed workings of DNA technology, explanation by qualified experts of this scientific discipline, its testing process, and the statistical calculus science will be crucial to the jury's understanding of the evidence. Therefore, presentation of expert testimony will be of undoubted help to the jury during its deliberations.
Although the State went into excruciating detail about the test results themselves, this Court does not believe that a Morel and DiPetrillo analysis require the Court to comment upon those end results at the preliminary hearing stage. "Once an expert has shown that the methodology or principle underlying his or her testimony is scientifically valid and that it `fits' an issue in the case, the expert's testimony should be put to the trier of fact to determine how much weight to accord the evidence." DiPetrillo at 689, 690. Based upon the evidence introduced by the State, the Court is satisfied with the forensic DNA typing procedures utilized by the State's witnesses. The detailed written laboratory protocols which were in place at the time of the testing have been submitted into evidence. The witnesses have described an objective and quantitative procedure for identifying the pattern of the samples of the defendant's DNA and that of the victim. The four State witnesses have described their procedure for declaring a match. And finally, nothing on the record suggests that any of the tissue or fluid samples which resulted in virtually conclusive findings implicating Jeremy Motyka presented any type of quality, quantity, or degradation issues.
This Court is aware of the Rhode Island Supreme Court's directive to also consider the prejudicial value to the defendant of any scientific evidence which the states seeks to introduce at trial. DiPetrillo at 688. As a general rule, this Court dares say that from the prosecution's perspective, the State always hopes that any and all evidence it introduces in a criminal trial will be of prejudice to the accused. Concomitantly, defense evidence is intended to be prejudicial to the State's case. That it is prejudicial does not make it irrelevant. That it is prejudicial does not make it inadmissible. If the probative value outweighs the prejudice to the defendant, it is usable. In this case, because the DNA testing is the State's primary evidence which ties Mr. Motyka to this crime, though prejudicial, it may be considered by the jury.
The Court has carefully reviewed the Defendant's arguments presented in his well and carefully crafted memorandum and attached appendix. During this hearing, the Court afforded defense counsel broad latitude in questioning the State's witness on all of the issues raised in the Defendant's brief, everything from the science of DNA to the intricate details of the procedures for testing and interpreting DNA evidence and PCR testing. The record in this case is completely devoid of any evidence suggesting the State's Lab or the Bode Lab failed to follow their validation protocols or accepted scientific techniques in testing the DNA material submitted to them for analysis. Concerns raised by the Defendant as to such things as possible sample contamination or subjective laboratory findings or unreliability of a particular type of PCR methodology, i.e. DQAlpha testing versus PCR STR procedures, have not been raised to any level, either through the presentation of defense experts, or through vigorous cross examination, warranting exclusion of the evidence. The Court notes that the Vermont bench decision, State of Vermont v. Michael Pfenning, Vermont District Court, Unit #3, Grand Isle Circuit, Slip Opinion #57-4-96Gier (Kupersmith, J., April 6, 2000), the Colorado bench decision, People of the State of Colorado v. Michael Eugene Schreck, District Court, County of Boulder, Slip Opinion #CR2475, Division 4 (Hale J., 2000), and the California bench decision, People of the State of California v. Bokin, Superior Court of the State of California, City and County of San Francisco, Slip Opinion #SCN: 168461 (Dondero, J., May 6, 1999) cited by the Defendant in his brief, discuss PCR scientific validation difficulties explored by those defendants therein through defense witnesses presented to those courts to rebut and contradict claims made by the State's experts. Such a record has not been made in the case. By this comment, the Court is not in any way trying to shift to the Defendant the State's "burden of going forth", or the State's preponderance of evidence burden.
Rather, the Court is simply noting that in order to meet its burden, the State has presented four credible witnesses, two of whom have been qualified by this Court as experts, and several written exhibits to prove the essential elements of the State's case. In this Court's opinion, the Defendant has not sufficiently challenged the State's evidence or adequately raised the issues discussed in his brief or discussed in the cases he cites. Accordingly, it would be unfair to the State to consider issues which the State has not had an opportunity to challenge or refute.
Like any science, DNA testing of any sort has its systematic flaws, is inherently in flux, and indeed is being constantly fine tuned for greater accuracy, discrimination and broader usage. However, all of the State's witnesses expressed their awareness of the substantive and procedural testing pitfalls raised by defense counsel which could affect their test results, and in accordance with their protocols, considered and addressed the problem areas as they went along. In this Court's opinion, the numerous areas probed by defense counsel do not go to the admissibility of the State's evidence but to the weight the jury wishes to accord this scientific and expert testimony.
For the reasons stated above, the Defendant's Motion in Limine is denied.
 II. The Defendant's Motion to Suppress Statements
The Defendant had also filed a Motion to suppress certain statements allegedly made by him on May 31, 1999, June 3, 1999, and June 24, 1999.
 Facts
The Court finds as a fact that on May 30, 1999, at approximately 11:00 p.m., Detective Sergeant Stephen Bannon of the Rhode Island State Police and several other police officers went to Jeremy Motyka's home at 1040 Wood Street, Fall River, Massachusetts, pursuant to the investigation of the death of Angela Spence Shaw. Not finding the Defendant at home, the police spoke to Mr. Motyka's neighbors about him and his possible whereabouts. Unsuccessful in their search to locate the Defendant, they departed.
The officers returned the next day, May 31, 2000, at approximately 10:00 a.m., to question the Defendant, as he was part of a 23 man construction crew renovating Ms. Spence Shaw's home at 127 Sakonnet Point Road, Little Compton, Rhode Island. They located the Defendant in front of his home and asked him if he would be willing to speak with them pursuant to their murder investigation. The Defendant agreed and spoke to Sgt. Bannon and Det. Joseph Dubeau for approximately 15 to 20 minutes. Sgt. Bannon testified at trial that at no time did any officer who was present threaten or coerce the Defendant in any way, nor did they physically or verbally restrain the Defendant's movement. The Defendant never sought to terminate the conversation. After completing their conversation with the Defendant, the officers departed, leaving the Defendant at his residence. On each occasion the police visited, they were outfitted in plain clothing, although they carried weapons underneath their outer clothing.
On June 3, 1999, Sgt. Bannon and other state and local police officers traveled to Defendant's work site in Adamsville, R.I., to have further discussions with the Defendant about the investigation.
Locating the Defendant at the side of the house at the work site, Mr. Motyka, at Sgt. Bannon's request, accompanied the officers to the driveway area, where he spoke with the three officers for approximately 20 minutes about conflicts in the information he had given the police during the earlier questioning. Sgt. Bannon again testified that the officers did not threaten of coerce the Defendant in any way to speak with them and they never verbally instructed the Defendant that he was not free to terminate the conversation and leave. On neither May 31 nor June 3, 1999, was the Defendant advised of his Miranda rights prior to being questioned by the investigating officers.
After obtaining a warrant for the Defendant's arrest, Sgt. Bannon and about seven other officers from the Little Compton Police Force and Massachusetts State Police, apprehended the Defendant at his Adamsville work site and placed him under arrest for the murder of Angela Spence Shaw. After his apprehension, the officers transported Mr. Motyka to the Little Compton Police Department for possible questioning. Upon his arrival, the Defendant was led into a small, approximately 10' by 10', conference room. The room had on one wall an above the eye level open window, six to eight feet long. It was furnished with a table and three to five chairs, and contained a phone. Det. Nicholas Tella testified that the Defendant was not hand cuffed or shackled while in this room. Sgt. Bannon testified that he advised the Defendant of his Miranda rights using a printed rights form which the State introduced into evidence. Sgt. Bannon also indicated that after Detective Tella had filled out a portion of the form that he then instructed the Defendant to read the form, initial each line if he read and understood it, and lastly sign the form as an indication that he understood what he had just read. The last portion of the form reads,
 I further admit and agree that:
 1) After having been informed of my constitutional rights, I do understand these rights, and I agree to give a statement at this time.
 8. I do not want an attorney called or appointed for me at this time.
Sgt. Bannon observed the Defendant read through the form. After finishing same, Mr. Motyka initialed each line including the last two paragraphs noted above and placed his signature at the bottom of the form. Sgt. Bannon witnessed the Defendant's signing. The Defendant made no comment, nor did he make any requests after reading the rights form. He expressed no lack of understanding of the rights form that he had read and signed. Also, the officers made no further inquiries of the Defendant relative to the rights form or his understanding of same. Thereafter, questioning by Cpl. Tella and Sgt. Bannon began. The questioning lasted from about 4:25 p.m. to 9:40 p.m.
During the questioning, the door was closed except for officers occasionally entering and exiting.
The Defendant was not allowed to leave the room during the interrogation but Cpl. Tella did indicate that the Defendant was given pizza, soda, and cigarettes, and that intermittent breaks were taken throughout Defendant's questioning. Neither officer has any recollection of Mr. Motyka going to the bathroom or requesting to do so. The Defendant never objected to his questioning, never said he was too tired to continue, never asked that the questioning cease, and never requested the assistance of counsel. Sgt. Bannon and Cpl. Tella each testified that no one ever threatened, coerced, or promised anything to the Defendant.
During the questioning, Mr. Motyka was shown the arrest affidavit that alleged a DNA match between the Defendant and the semen found within the victims body, and was asked whether he could provide an explanation for the purported match. The theory advanced by the Defendant, approximately 1 — to two hours into the questioning, was deemed "brazen, bold, arrogant, bizarre, and preposterous" by the officers. As a result of their opinion about the Defendant's statement, the officers asked the Defendant if he would allow them to record his theory on how his semen may have found its way into Ms. Spence Shaw's vaginal cavity. The Defendant agreed to this request. At the outset of the recording, the Defendant was asked if he had previously been advised of his constitutional rights and whether he understood those rights. He responded by saying, "Correct." The taping proceeded and was later transcribed and presented to the Defendant for review. The Defendant signed the transcript, indicating that he had reviewed it and agreed with its content.
Mr. Motyka's interrogation continued. He gave a second tape recorded statement which detailed his activities on May 29 and 30, 1999, and again, gave an explanation of how his semen could have been found within the decedent. The transcript of the second taping was presented to the Defendant the following morning for review. Mr. Motyka spent about twenty minutes reading the statement and signed it without correction.
Sgt. Bannon admitted that during the entire examination, he and Cpl. Tella may have raised their voices — not in anger but in disbelief, may have called the Defendant a liar, may have cursed during the questioning, and expressed frustration with Mr. Motyka's semen explanation. According to the officers, the Defendant was never threatened or coerced in any way. Both denied ever pushing, grabbing, striking, or beating Mr. Motyka, or making any physically threatening gestures whatsoever towards him.
Nor did they threaten to charge the Defendant's girlfriend with conspiracy, or place their child in DCYF custody. While admitting to asking the Defendant about any history of sexual molestation, the officers denied ever calling Mr. Motyka a sexual pervert.
 Discussion
With respect to the May 31, 1999 and June 3, 1999 questioning, the Defendant argues that on each of those occasions he was in police custody and therefore entitled to his Miranda rights before being questioned. Because he was not afforded these Miranda protections, the Defendant urges that the statements he made to the police on those two dates be suppressed. The State contends that on each of these days, the Defendant was not in police custody and thus not entitled to any Miranda warnings. Accordingly, the prosecution argues that it must only show that the Defendants statements were voluntary.
A defendant is seized or in custody within the meaning of the Fourth Amendment, and therefore entitled to Miranda protections, if in view of all the circumstances, a reasonable person would believe that he was not free to leave. State v. Griffith, 612 A.2d 21, 23 (R.I. 1992); State v. Diaz, 654 A.2d 1195, 1204 (R.I. 1995). Recently reiterating its Diaz principles in State v. Briggs, the court set forth the factors which the court must consider in determining whether an individual is in custody:
 (1) the extent to which the person's freedom is curtailed; (2) the degree of force employed by the police; (3) the belief of a reasonable, innocent person in identical circumstances; and (4) whether the person had the option of not accompanying the police. 756 A.2d 731, 737 (R.I. 2000) (citing Diaz, 654 A.2d 1195).
After reviewing the evidence before the Court and applying the above factors, this Court concludes that the Defendant was not in police custody on May 31, 1999 and June 3, 1999 when questioned by the police. Admittedly, in a Charlie Chan sense, that "Suspicion, like raindrops, fall on everyone," Mr. Motyka may have been a suspect in the very broadest sense of the word as he was one of several known persons to have had contact with Angela Spence Shaw within the days before she was murdered. He was one of several members of a construction crew performing renovations to the decedent's home and was one amongst the several workers appropriately targeted for questioning in this investigation. At the time the State Police and other officers approached the Defendant at his home on May 31, there is no evidence to suggest that Mr. Motyka was under any greater suspicion than the other workmen similarly situated.
Several officers accompanied Sgt. Bannon to the Defendant's home on the 31st, and found him outside of his home with other persons. In response to the Sgt.'s inquiry, the Defendant identified himself and agreed to speak with the police. The conversation took place near the Defendant's car and away from his friends. The police indicated to Mr. Motyka that they were there to investigate the murder of Angela Spence Shaw and the Defendant agreed to answer questions about his whereabouts and activities on the days of May 29 and 30, 1999.
During the questioning, the Defendant was not restrained, was never told he could not leave, and did not ever attempt or request to do so. Though they were armed, there is nothing to suggest that any of the officers made any type of show of force to the Defendant with weapons or otherwise. The Defendant was never threatened, coerced, or promised anything by the police. Under the conditions of the Defendant's questioning, there is nothing on the record to suggest that a reasonable, innocent person in such circumstances would have felt unduly pressured or compelled to stand in the driveway and speak with the police about this murder investigation. The uncontradicted evidence establishes that Defendant freely, voluntary and without duress, spoke to Sgt. Bannon and others on May 31, 1999, and that at such time, he was not in police custody when he made his statement.
On June 3, 1999, the police again sought out Mr. Motyka after investigating the information he provided to them on the 31st. Sgt. Bannon, accompanied by several other state and local officers located the Defendant at his Little Compton work site. They asked Mr. Motyka, who admittedly had not been given prior notice of this meeting, to accompany them to a driveway area about 30 feet from where he was working. Without protest or hesitation, he willingly agreed to do so. Sgt. Bannon planned to question the Defendant about additional information the police had learned during this investigation, specifically about a then pending criminal charge against the Defendant in Massachusetts and about some inconsistencies in his prior statement.
Although the officers, some in plain clothes, some in uniform, were armed during this 15 to 20 minutes of questioning, there is no evidence on the record to suggest that Mr. Motyka was verbally or physically threatened, coerced, or restrained in any fashion. Nor, as Defendant urges, can any such reasonable inference of fear or intimidation be drawn based upon what he contends was inherently coercive and impairing police questioning on that date.
Additionally the Court does not find that the subject matter of the questioning automatically catapulted Mr. Motyka into the category of primary murder suspect. Whereas the information about which the Defendant was questioned may have caused some growing suspicion about the Defendant in the minds of the investigating team, that suspicion was never communicated to the Defendant. The subjective intentions of the officers on the issue of detention are irrelevant, rather the Court must focus on what the police actually communicated to the Defendant. State v. Ferola, 518 A.2d 1339, 1343-44 (R.I. 1986). "An investigating officer's unarticulated plan has no bearing on whether a person is in custody at a particular time. The lack of any communication concerning the murder investigation is crucial because the only relevant inquiry is how a reasonable person would have understood his or her situation" Briggs, 756 A.2d at 737 (citing Diaz, 654 A.2d at 1204-05).
The Court finds that on each of the dates in question, Mr. Motyka, when questioned, was not in the custody of the police, was free to leave had he chosen to do so, and accordingly, was not entitled to any prior Miranda warnings. Further, the Court finds that all statements made by the Defendant to the police on May 31 and June 3, 1999 were freely and voluntarily given and not the product of force, coercion, improper inducements, or undue or improper influence.
As to the June 24, 1999 statements the Defendant made after his arrest at the Little Compton police station, it is the Defendant's contention that these statements should be suppressed, as he did not knowingly, intelligently, and voluntarily waive his constitutional rights before speaking with the police.
The State counters that it has proven by clear and convincing evidence that there has been a valid waiver of such rights and that the Defendant's statements were voluntary and should be admissible at trial.
To determine if the Defendant has made a knowing, intelligent and voluntary rights' waiver, and a voluntary statement, the Court must view the totality of the circumstances surrounding the waiver and statement. State v. Leuthavone, 640 A.2d 515, 519 (R.I. 1994). If the defendant does properly waive his rights, the police are free to question him. State v. Sabetta, 680 A.2d 927, 932 (R.I. 1996). In the case at hand, the evidence indicates that the Defendant was not questioned until his arrival at the Little Compton police station and then, not before he was given a constitutional rights form to review and consider. In accordance with the Court's previous finding, the Defendant was asked to read the form and if he understood each line, to initial same and sign at the bottom of the form. He did so. There is no evidence on the record to indicate that the Defendant was unable to read and comprehend the form that he had been handed. Nor does the record in any way suggest that Mr. Motyka was at any time forced into signing what he had read.
Part of the form which Mr. Motyka initialed and signed is an admission by the Defendant that he had been informed of his rights, understood them, and agreed to give a statement. Further, one line initialed by Mr. Motyka was his acknowledgment that he did not wish to have an attorney called or appointed. Sgt. Bannon observed Mr. Motyka read, initial and sign the rights form. Although he did not specifically ask the Defendant thereafter whether he wanted to waive the rights listed on the form, there is no requirement that he do so once he reasonably concluded Mr. Motyka understood what he had just reviewed and signed. State v. White, 512 A.2d 1370, 1375 (R.I. 1986).
The Court also notes that both times the Defendant gave a taped statement on that evening, he admitted having received his Miranda rights and acknowledged his understanding of them. At no time did he ever protest being questioned or providing answers. Mr. Motyka did refuse to respond to questions about whether he, personally, had ever been the victim of any type of sexual assault or molestation. In so refusing, Mr. Motyka demonstrates to the Court his understanding of his right not to answer questions posed to him by the police, and proves to the Court that he was not overborne by the officers' behavior.
With respect to the total environment in which the Defendant was questioned, the Court does not believe it was one that deprived Mr. Motyka of his free will, choice, and thinking. According to Cpl. Tella, the Defendant was not cuffed, not physically or psychologically abused, and was not deprived of food or beverage, cigarettes, or bathroom access. Though the questioning went on for over five hours in a somewhat small room, the uncontroverted evidence is that breaks occurred in the Defendant's questioning. Moreover, although the police used questioning tactics that included loud talk, demonstrations of frustration, expressions of incredulity, and accusations of falsehoods, the record discloses no improper or nefarious police behavior which would suggest that Mr. Motyka became fearful or that he lost his free will or his ability to think and reason. See State v. Griffith, 612 A.2d 21.
Finally, the fact that the Defendant was aggressively examined about the arrest affidavit and its DNA conclusions, or other information uncovered during the investigation, or that only 35 minutes of Mr. Motyka's discussions were tape recorded does not cause the Court to conclude that the Defendant's Fifth Amendment privileges were unconstitutionally abridged.
For the reasons indicated above, the Court holds that all challenged statements made by the Defendant were made within the context of Mr. Motyka's constitutional rights. As such, the Defendant's Motion to Suppress is denied.